UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHONDELL PAUL,<br>                              Plaintiff,<br>        vs.<br><br>ANTHONY J. ANNUCCI, Acting Commissioner, Department of Corrections and Community Supervision; JOSEPH H. NOETH, Deputy Commissioner for Correctional Facilities; SANDRA AMOIA, Assistant Commissioner and Former Acting Deputy Commissioner for Correctional Facilities; JAMES A. O'GORMAN, Former Deputy Commissioner for Correctional Facilities; CHRISTOPHER L. MILLER, Assistant Commissioner and Former Superintendent of Great Meadow Correctional Facility; AMY L. LAMANNA, Superintendent of Five Points Correctional Facility; AMY TITUS, Former Acting Superintendent of Five Points Correctional Facility; ANTHONY RODRIGUEZ, Director of DOCCS Special Housing and Inmate Disciplinary Program and Former Assistant Director of DOCCS Special Housing and Inmate Disciplinary Program; DONALD E. VENETTOZZI, Former Director of DOCCS Special Housing and Inmate Disciplinary Program; GERARD A. CARON, MATTHEW D. RYAN, KATHRYN J. CRESSWELL, and SCOTT J. COOK, members of the DOCCS Facility Level Review Committee at Great Meadow; and THOMAS E. DELMAR, LANCE R. TUCKER, and STEPHEN M. WOODWARD, members of the DOCCS Facility Level Review Committee at Five Points,<br>                              Defendants. | Case No. 9:21-cv-000476<br>(BKS)(TWD)<br><br><br>**FIRST AMENDED<br>COMPLAINT**<br><br><br>**JURY TRIAL<br>REQUESTED** |

Plaintiff Shondell Paul ("Plaintiff" or "Mr. Paul"), by his counsel Sidley Austin LLP, as and for this Complaint, alleges the following:

## INTRODUCTION

1.     This is a civil rights action for injunctive and declaratory relief, as well as compensatory and punitive damages, under 42 U.S.C. § 1983 ("Section 1983") for violations of Mr. Paul's rights to due process under the Fourteenth Amendment to the Constitution of the

United States and to be free from cruel and unusual punishment under the Eighth Amendment to the Constitution of the United States.

2.      For nearly 18 consecutive years, Mr. Paul has been subjected to long-term, cumulative, and continuous punishment by being placed in solitary confinement in a Special Housing Unit ("SHU") [1] while in the custody of the New York Department of Corrections and Community Supervision ("DOCCS").  Mr. Paul has been confined alone in a concrete cell the size of a parking space for 20 to 22 hours per day.  He is denied meaningful human contact for extended periods of time.  Mr. Paul has fewer rights and privileges than do persons in the general prison population.  He eats alone from a tray provided to him through a slot in his door and, for nearly 16 years, was denied access to therapeutic or mental health groups and programs.  He has effectively been denied regular access to outdoor activity, as well as access to religious, vocational, recreational, and educational programs.

3.      On August 26, 2020, Mr. Paul was transferred to a Residential Mental Health Unit ("RMHU").  Although "[o]nce admitted to the RMHU, inmate patients are not considered to be in SHU,"[2] the conditions of Mr. Paul's confinement remain substantially similar to those of solitary confinement in the SHU.  For his first year in the RMHU, Mr. Paul spent at least 22

---

[1] Mr. Paul uses the term "solitary confinement" to refer to his confinement in the SHU under Administrative Segregation ("Ad Seg") status, including his continued solitary confinement in the Residential Mental Health Unit ("RMHU").  The National Commission on Correctional Health Care similarly defines solitary confinement as "the housing of an adult or juvenile with minimal to rare meaningful contact with other individuals."  National Commission on Correctional Health Care, Position Statement on Solitary Confinement (Isolation) (2016), *available at* http://www.ncchc.org/solitary-confinement.  This confinement has other names, including isolated confinement, extreme isolation, segregation, room restriction, and SHU, but, in all cases, the person experiences the same harmful isolation and other deprivations.

[2] New York State Office of Mental Health and New York State Department of Correctional Services, *Residential Mental Health Unit Program Operations Description* at 3 (Dec. 7, 2009).

hours per day in his cell, leaving only for two hours[3] of programming each weekday. Beginning in approximately March 2022, Mr. Paul has spent at least 20 hours per day in his cell, leaving only for four hours of programming each weekday.

4. It is well established that prolonged solitary confinement causes severe harm and has compounding negative effects, especially on the young, disabled, and mentally ill. Nevertheless, DOCCS subjects numerous New York State prisoners, including Mr. Paul, to prolonged solitary confinement.

5. Mr. Paul's years of solitary confinement have caused and continue to cause him to suffer enduring physical and emotional trauma. He has been diagnosed with Persistent Depressive Disorder due to his depressed mood, insomnia, low energy, and overwhelming feelings of hopelessness. Mr. Paul's mental health has continued to deteriorate over the past decade due to prolonged isolation—his assigned Mental Health Level has progressed from a Level 6 ("does not require mental health services") to a Level 2S ("diagnosed with Serious Mental Illness"), culminating in his attempted suicide in the spring of 2020. Yet, Defendants have allowed Mr. Paul's mental condition to worsen by keeping him in restricted and solitary environments for nearly 18 years.

6. Through their policies and practices as well as other acts and/or omissions, Defendants have subjected Mr. Paul to solitary confinement for an unreasonable and unconstitutional length of time, in knowing disregard of the lack of justification for such confinement. Defendants have failed to provide Mr. Paul with constitutionally adequate due process regarding the review of his administrative segregation status, instead effectively rubber-stamping such reviews for nearly 13 years.

---

[3] The RMHU is intended to provide four hours of programming per day; however, the amount of programming was reduced to two hours per day in 2020 and 2021 because of COVID-19 restrictions.

## JURISDICTION AND VENUE

7.     The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 and 1343, by virtue of claims under 42 U.S.C. §§ 1983 and 1988, as well as the Eighth

and Fourteenth Amendments.  Moreover, the Court can order declaratory relief pursuant to

28 U.S.C. §§ 2201 and 2202.  Rule 65 of the Federal Rules of Civil Procedure authorizes

injunctive relief.  This Court has the authority to award costs and attorneys' fees under

42 U.S.C. § 1988.

8.     Venue is proper within this judicial district under 28 U.S.C. § 1391(b)(2) because

a substantial portion of the events constituting Mr. Paul's claims have taken place within this

district while he has been imprisoned in New York State.

## PARTIES

9.     Plaintiff SHONDELL PAUL is a 41-year-old man presently held in the custody of

the New York State Department of Corrections and Community Supervision at Five Points

Correctional Facility ("Five Points") in Romulus, New York.  Mr. Paul was, on the dates and

times hereinafter mentioned, also confined at Attica Correctional Facility ("Attica"), Upstate

Correctional Facility ("Upstate"), Clinton Correctional Facility ("Clinton"), and Great Meadow

Correctional Facility ("Great Meadow").  The allegations in this Complaint are based upon Mr.

Paul's personal knowledge, as well as upon information and belief.

### DEFENDANTS

10.     At all times relevant to Mr. Paul's causes of action, each Defendant named herein

was employed by, and acted under color of law of, the State of New York.

11.     Plaintiff asserts each and every allegation relating to "Defendants" individually as

each such Defendant included in such definition, and such pleading referring to such defined

Defendants is for convenience and economy only and the avoidance of repetition.

<u>DOCCS Commissioner</u>

12.    ANTHONY J. ANNUCCI, as Acting Commissioner of DOCCS (since approximately April 2013), is responsible for the care, custody, and control of all prisoners housed in DOCCS facilities.  The DOCCS Commissioner has final policy-making and supervisory authority within DOCCS and is personally involved in authorizing and maintaining the unconstitutional policies and customs challenged by Mr. Paul.  Annucci is responsible for the overall management and operation of DOCCS, which includes oversight of correctional institutions and assuring compliance with state and federal law.  His responsibilities include reviewing and approving the transfer of prisoners to Special Housing Units, including Administrative Segregation, under a Central Office placement.  Upon information and belief, Defendant Annucci approved Mr. Paul's continued solitary confinement for a period of time relevant to this action.  He is being sued in his individual and official capacities.

13.    Defendant Annucci is aware of the unconstitutional policies and practices used by DOCCS to keep prisoners in solitary confinement for lengthy periods of time.  As a defendant in *Peoples v. Annucci*, No. 11 Civ. 2694 (S.D.N.Y. April 18, 2011), Annucci is well aware of claims filed by prisoners subjected to lengthy periods of confinement in SHU and the resulting unconstitutional risk of harm to prisoners.  Despite his awareness of the unconstitutional risk of harm to prisoners, including Mr. Paul, Defendant Annucci has failed to remedy the unconstitutional policies and practices that have enabled the violations of Mr. Paul's rights.

<u>DOCCS Deputy Commissioner</u>

14.    JOSEPH H. NOETH, as Deputy Commissioner for Correctional Facilities, has policy-making and supervisory authority within DOCCS and is personally involved in authorizing and maintaining the unconstitutional policies and customs challenged by Mr. Paul. Under DOCCS regulations, the DOCCS Deputy Commissioner has the authority to make

determinations whether to retain the prisoner in solitary confinement or to release the prisoner from Ad Seg.[4]

15.     Upon information and belief, the DOCCS Deputy Commissioner,[5] as an executive officer of DOCCS, instituted policies that caused Mr. Paul's placement in Administrative Segregation and the lack of meaningful review of his Ad Seg status.

16.     As Deputy Commissioner, Defendant Noeth is responsible for the overall management and operation of the correctional institutions within DOCCS.  From approximately March 2021 through the present, his responsibilities have included reviewing and approving periodic reviews for an incarcerated individual's continuation in, or removal from, Administrative Segregation.  By law, Noeth was the final arbiter of Mr. Paul's continued placement in solitary confinement.[6]  Upon information and belief, Noeth approved Mr. Paul's continued confinement in Administrative Segregation for a period of time relevant to this action. This approval process included signing each of Mr. Paul's Ad Seg reviews recommending that Mr. Paul remain confined to solitary confinement, in knowing disregard of the lack of justification for such confinement.  Noeth is being sued in his individual and official capacities.

17.     SANDRA AMOIA, as former Acting Deputy Commissioner for Correctional Facilities and current Assistant Commissioner, had policy-making and supervisory authority within DOCCS and was personally involved in authorizing and maintaining the unconstitutional policies and customs challenged by Mr. Paul.  Under DOCCS regulations, the DOCCS Deputy

---

[4] *See* 7 N.Y.C.R.R. § 301.4(d)(3).

[5] The DOCCS Deputy Commissioner, along with the DOCCS Commissioner, will be referred to as the "DOCCS Commissioner Defendants."

[6] *See* 7 N.Y.C.R.R. § 301.4(d)(3).

Commissioner has the authority to make determinations whether to retain the prisoner in solitary confinement or to release the prisoner from Ad Seg.

18.    Upon information and belief, the DOCCS Deputy Commissioner, as an executive officer of DOCCS, instituted policies that caused Mr. Paul's placement in Administrative Segregation and the lack of meaningful review of his Ad Seg status.

19.    As former Acting Deputy Commissioner, Defendant Amoia was responsible for the overall management and operation of the correctional institutions within DOCCS.  From approximately December 2020 through February 2021, her responsibilities included reviewing and approving periodic reviews for an incarcerated individual's continuation in, or removal from, Administrative Segregation.  By law, Amoia was the final arbiter of Mr. Paul's continued placement in solitary confinement.   Upon information and belief, Amoia approved Mr. Paul's continued confinement in Administrative Segregation for a period of time relevant to this action. This approval process included signing each of Mr. Paul's Ad Seg reviews recommending that Mr. Paul remain confined to solitary confinement, in knowing disregard of the lack of justification for such confinement.  Amoia is being sued in her official and individual capacities.

20.    JAMES A. O'GORMAN, as former Deputy Commissioner for Correctional Facilities, had policy-making and supervisory authority within DOCCS and was personally involved in authorizing and maintaining the unconstitutional policies and customs challenged by Mr. Paul.  Under DOCCS regulations, the DOCCS Deputy Commissioner has the authority to make determinations whether to retain the prisoner in solitary confinement or to release the prisoner from Ad Seg.[7]

---

[7] *See* 7 N.Y.C.R.R. § 301.4(d)(3).

21.     Upon information and belief, the DOCCS Deputy Commissioner,[8] as an executive officer of DOCCS, instituted policies that caused Mr. Paul's placement in Administrative Segregation and the lack of meaningful review of his Ad Seg status.

22.     As former Deputy Commissioner, Defendant O'Gorman was responsible for the overall management and operation of the correctional institutions within DOCCS.  From approximately 2015 through December 2020, his responsibilities included reviewing and approving periodic reviews for an incarcerated individual's continuation in, or removal from, Administrative Segregation.  By law, O'Gorman was the final arbiter of Mr. Paul's continued placement in solitary confinement.[9]  Upon information and belief, O'Gorman approved Mr. Paul's continued confinement in Administrative Segregation for a period of time relevant to this action.  This approval process included signing each of Mr. Paul's Ad Seg reviews recommending that Mr. Paul remain confined to solitary confinement, in knowing disregard of the lack of justification for such confinement.  O'Gorman is being sued in his individual capacity.

## DOCCS Superintendents

23.     The DOCCS Superintendents are and at all relevant times were responsible for the care, custody, and safety of all prisoners under their immediate jurisdiction.  In this role, the DOCCS Superintendents are and at all relevant times were personally involved in the care, custody, and condition of prisoners in Ad Seg and RMHU, including Mr. Paul.[10]  The DOCCS

---

[8] The DOCCS Deputy Commissioner, along with the DOCCS Commissioner, will be referred to as the "DOCCS Commissioner Defendants."

[9] *See* 7 N.Y.C.R.R. § 301.4(d)(3).

[10] *See* 7 N.Y.C.R.R. § 300.2(a) (stating that the Superintendent designates certain areas of the facility as Special Housing Units).

Superintendents are and at all relevant times were personally involved in the decision to confine inmates to Ad Seg and RMHU, including Mr. Paul.  Under DOCCS regulations, the Superintendent of the facility is required to make an independent determination whether to retain the inmate in solitary confinement or to release the inmate from Administrative Segregation.[11] The DOCCS Superintendents are also responsible for reviewing inmates' complaints and grievances.

24.    AMY L. LAMANNA is the Superintendent of Five Points Correctional Facility, where Mr. Paul is currently housed in the RMHU.  Defendant Lamanna has policy-making and supervisory authority with regard to all operations at Five Points.  As Superintendent, she reviews disciplinary hearings resulting in solitary confinement penalties, as well as prisoners' complaints and grievances submitted after their disciplinary hearings.  Upon information and belief, Defendant Lamanna approved of keeping Mr. Paul confined in the RMHU, in knowing disregard of the lack of justification for such confinement.  Lamanna is being sued in her individual and official capacities.

25.    AMY TITUS is the former Acting Superintendent of Five Points Correctional Facility, where Mr. Paul is currently housed in the RMHU.  Defendant Titus had policy-making and supervisory authority with regard to all operations at Five Points.  As Acting Superintendent, she reviewed disciplinary hearings resulting in solitary confinement penalties, as well as prisoners' complaints and grievances submitted after their disciplinary hearings.  Upon information and belief, Defendant Titus approved of keeping Mr. Paul confined in the RMHU, in knowing disregard of the lack of justification for such confinement.  Titus is being sued in her individual capacity.

---

[11] *See* 7 N.Y.C.R.R. § 301.4(d)(2).

26.     CHRISTOPHER L. MILLER is the former Superintendent of Great Meadow Correctional Facility, where Mr. Paul was housed in Administrative Segregation and the Behavioral Health Unit ("BHU"), and currently serves as DOCCS Assistant Commissioner.  At all times relevant to this action, Defendant Miller had policy-making and supervisory authority with regard to all operations at Great Meadow.  As Superintendent, he reviewed disciplinary hearings resulting in solitary confinement penalties, as well as prisoners' complaints and grievances submitted after their disciplinary hearings.  Upon information and belief, Defendant Miller approved of keeping Mr. Paul confined in Administrative Segregation, in knowing disregard of the lack of justification for such confinement.  Miller is being sued in his individual and official capacities.

DOCCS Special Housing Unit Director

27.     ANTHONY RODRIGUEZ is the Director of DOCCS Special Housing and Inmate Disciplinary Program, a position he has held from approximately 2021, and previously served as the Assistant Director of DOCCS Special Housing and Inmate Disciplinary Program from approximately 2015 through 2020.  As SHU Director, Defendant Rodriguez has policy-making and supervisory authority with regard to SHU and the DOCCS disciplinary process. Rodriguez's authority includes reviewing, affirming, modifying, or reversing dispositions imposed at Tier III hearings.

28.     Defendant Rodriguez directly contributed to Mr. Paul's indefinite solitary confinement, as he reviewed Mr. Paul's disciplinary appeals and made the final determination as to his punishment.  Upon information and belief, Defendant Rodriguez denied Mr. Paul meaningful review of his Ad Seg status.  Rodriguez is being sued in his individual and official capacities.

29.     DONALD E. VENETTOZZI is the former Director of DOCCS Special Housing and Inmate Disciplinary Program, a position he held from approximately 2015 through 2021, and, upon information and belief, currently serves as First Deputy Superintendent for Mohawk Correctional Facility.  As SHU Director, Defendant Venettozzi had policy-making and supervisory authority with regard to SHU and the DOCCS disciplinary process.  Venettozzi's authority included reviewing, affirming, modifying, or reversing dispositions imposed at Tier III hearings.

30.     Defendant Venettozzi directly contributed to Mr. Paul's indefinite solitary confinement, as he reviewed Mr. Paul's disciplinary appeals and made the final determination as to his punishment.  Upon information and belief, Defendant Venettozzi denied Mr. Paul meaningful review of his Ad Seg status.  Venettozzi is being sued in his individual and official capacities.

<u>DOCCS Facility Level Review Committee</u>

31.     Upon information and belief, DOCCS utilizes a Facility Level Review Committee ("FLRC") at each facility to review the status of inmates held in Administrative Segregation. The FLRC is a three-member committee comprised of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff.[12]  Under DOCCS regulations, the FLRC is required to examine the inmate's institutional record and prepare and submit to the Superintendent or designee a report setting forth the following: (1) reasons why the inmate was initially determined to be appropriate for Administrative Segregation; (2) information on the inmate's subsequent behavior and attitude; and (3) any other factors that the committee believes may favor retaining the inmate in or releasing the inmate from

---

[12] *See* 7 N.Y.C.R.R. § 301.4(d)(1).

Administrative Segregation.[13]  The FLRC is required by DOCCS directives to make "recommendation[s]" to the Superintendent (or, in cases in which Central Office review has been directed, to the Central Office three-member committee).[14]  However, upon information and belief, in practice it exercises de facto power over an inmate's Administrative Segregation status because Superintendents regularly rubber-stamp the recommendation without independent analysis.

32.    Hereinafter, the FLRC Defendants are: GERARD A. CARON, MATTHEW D. RYAN, KATHRYN J. CRESSWELL, and Sergeant SCOTT J. COOK, members of the DOCCS FLRC at Great Meadow during Mr. Paul's confinement at that facility; and THOMAS E. DELMAR, Lieutenant LANCE F. TUCKER, and STEPHEN M. WOODWARD, members of the DOCCS FLRC at Five Points during Mr. Paul's confinement at that facility.[15]

## STATEMENT OF FACTS

33.    Mr. Paul has been continuously held in solitary confinement by Defendants since 2004, when he was 23 years old.  He was transferred from disciplinary confinement to Administrative Segregation ("Ad Seg") in 2009.  Ad Seg is a type of solitary confinement imposed on prisoners who are alleged to pose a severe threat to the safety of prison staff or members of the general prison population.  From August 2020 to present, Mr. Paul has been housed in the RMHU at Five Points.[16]  He is currently 41 years old.

---

[13] *Id.*

[14] *Id.*

[15] Mr. Paul was confined at Great Meadow from 2016 to August 2020 and at Five Points from August 2020 to present.

[16] As discussed *infra*, Mr. Paul's transfer to the RMHU has not ameliorated the isolating conditions of his confinement.

<u>Early Life</u>

34.     Mr. Paul was born and raised in Syracuse, New York.  He is the youngest child of Elizabeth Murry and Kamy Paul, who were married for over 35 years before they divorced in 1997.  Mr. Paul maintains a close relationship with his mother.  He was also close with his father, who recently passed away from lung cancer.

35.     Mr. Paul had a chaotic childhood, living in foster care, a group home, juvenile detention facilities, and residential treatment facilities throughout most of his teen and pre-teen years.

<u>Initial Placement at Attica</u>

36.     On May 23, 2001, Mr. Paul was committed to the care and custody of DOCCS at the age of 20 following convictions for second-degree murder, robbery, burglary, assault, and criminal possession of a weapon.  The convictions stemmed from Mr. Paul's involvement, along with four others, in the robbery of a gambling den, during which two persons were killed.  Mr. Paul was 19 years old at the time of this crime; although he did not fire a weapon, he was charged with second-degree murder under the theory of felony murder.

37.     Mr. Paul was initially placed into general population at Attica Correctional Facility in Attica, New York, one of America's most notorious prisons.  As documented by the Marshall Project and the *New York Times*, for years Attica officers falsified misbehavior reports and lied about being assaulted to justify using force on prisoners.[17]

38.     In the summer of 2004, Mr. Paul was moved to Attica's A-Block to serve as a porter.  As a new arrival, he became a target for A-Block officers.  One night, while the inmates were heading to recreation, an officer placed Mr. Paul against the wall, purportedly to perform a

---

[17] *How Video Cameras Tamed the Infamous Attica Prison*, The Marshall Project (Apr. 9, 2018), *available at* https://www.themarshallproject.org/2018/04/09/spying-on-attica.

routine pat-down for contraband.  However, the officer went beyond the routine pat-down and attempted to perform an unwarranted rectal cavity search.[18]  When Mr. Paul protested this unlawful body cavity search, multiple officers assaulted him, then sent him back to his cell.

39.    Following this assault, the A-Block officers proceeded to place Mr. Paul "on the burn," meaning that they refused to open his cell to let him out for recreation, programming, or even meals.

40.    When inmates were placed "on the burn" at Attica, any fellow inmates who dared to offer food or assistance risked being placed "on the burn" themselves.[19]  Mr. Paul grew increasingly despondent as he spent over two weeks locked in his cell, without food, cut off from all communication with others.

41.    When Mr. Paul was finally let out of his cell over two weeks later, on July 29, 2004, he proceeded to attack the officers responsible for assaulting him—and subsequently placing him "on the burn"—with a homemade shank.  As a result of this attack, Mr. Paul was charged and convicted of second-degree attempted murder and, following a disciplinary hearing, subsequently sentenced to 10 years of disciplinary segregation.

---

[18] Pursuant to DOCCS Directive No. 4910, a body cavity search may not be authorized without first obtaining approval from the Deputy Commissioner for Correctional Facilities and the Deputy Commissioner/Chief Medical Officer or designee.  A body cavity search may only be authorized in circumstances where there are compelling reasons to believe that the inmate to be searched has secreted contraband in an oral and/or genital cavity—*rectal cavity searches will not be authorized*.  Approved examinations must be conducted by a personal care physician (PCP) and made in an appropriate examining room using acceptable aseptic techniques for such an exam (*e.g.*, draping, positioning, and explanation of the procedure to be performed).  Prior to conducting a body cavity search, the PCP must explain the process to the inmate and the inmate must be given the opportunity to yield the contraband voluntarily.  On all occasions that a body cavity search is conducted, the incident must be reported to the Department's Communication Control Center with the follow-up submission of the required Unusual Incident Report.

[19] *See How Video Cameras Tamed the Infamous Attica Prison*, The Marshall Project (Apr. 9, 2018), *available at* https://www.themarshallproject.org/2018/04/09/spying-on-attica.

<u>Disciplinary Segregation</u>

42.    Along with imposing Ad Seg status, prison officials have authority to punish prisoners who break prison rules and regulations, or the law.  Officials may place these prisoners into disciplinary segregation as punishment.  However, prisoners may only be placed into disciplinary segregation for a specified time period following a disciplinary hearing.

43.    On August 6, 2004, following a 40-minute hearing, Mr. Paul was sentenced to 10 years of disciplinary segregation.  Although 7 N.Y.C.R.R. § 254.5 grants inmates the right to call witnesses for purposes of a Tier III disciplinary hearing, Mr. Paul was told by the hearing officer that it would be futile for him to call any witnesses in his defense.  Mr. Paul nevertheless did exercise his right to list several witnesses who could attest to his treatment prior to the attack, but was told by the hearing officer that these witnesses "could not be located" for the hearing.

44.    Following this hearing, Mr. Paul was transferred to Upstate Correctional Facility in Malone, New York to serve his sentence of 10 years of disciplinary segregation.

45.    Pursuant to DOCCS Directive No. 4933B and 7 N.Y.C.R.R. § 254.9, inmates who are serving time in disciplinary segregation may submit requests to the facility's superintendent for discretionary time cuts to their SHU sentences.  On August 25, 2006, Upstate Superintendent R.K. Woods granted Mr. Paul a time-cut of one year, writing: "Your positive adjustment during your first two years of this SHU confinement certainly deserves some consideration as well.  [ . . . ] Your case is perplexing because your misbehavior is at one end of the spectrum and your adjustment since then is at the other end.  [ . . . ] I am willing to recognize your very positive efforts for the past two years, and I will grant a time cut of one year.  Also, if you maintain the same exemplary behavior for another twelve months, you may write to me for additional time cut consideration."

46.     On July 18, 2007, Superintendent Woods granted Mr. Paul an additional one-year time-cut, writing: "Another year has passed since I granted your last discretionary time cut. That now makes your period of positive adjustment three years long. Again this last year you have remained free of discipline and comported yourself in an acceptable manner with staff. [ . . . ] I agree that you need to get back to general population to reestablish ties and to become involved with programs that may help you address your issues. I believe you are focused on the right path. [ . . . ] Maintain your focus, you are doing this the right way."

47.     On March 14, 2008, Superintendent Woods granted Mr. Paul an additional time-cut of 18 months, writing: "In July, you will have served four years with no disciplinary [actions] following the very serious incident that brought you to Upstate SHU. [ . . . ] You have continued to comport yourself in a positive way and you have quietly continued to serve your time in SHU. [ . . . ] Your revised release date will now be 1/29/2011. I trust this will serve to keep you focused and it is a written record of progress towards your goal for future reference."

48.     On December 31, 2008, the new Upstate Superintendent, Joseph Bellnier, granted Mr. Paul an additional 20-week reduction to his SHU sanction, writing: "I find that a reduction of your current disciplinary sanction(s) is warranted."

49.     On or about April 2009, while still serving his disciplinary SHU sentence, Mr. Paul was transferred from Upstate to Clinton Correctional Facility in Dannemora, New York. On July 7, 2009, the Clinton Confinement Review Committee reviewed Mr. Paul's record and approved a 60-day suspension of several of his sanctions, setting a SHU release date of July 26, 2009, "pending [Mr. Paul's] continued good behavior."

50.     Mr. Paul conducted himself in an exemplary manner during his time in disciplinary segregation, receiving no misbehavior reports at all for five consecutive years. In

recognition of Mr. Paul's exemplary behavior and positive adjustment, DOCCS officials halved his SHU sanctions—from an initial sentence of 10 years, to five years of disciplinary segregation.  The DOCCS officials who granted these time-cuts made clear their belief that Mr. Paul could safely be returned to the general population.

<u>Transfer from Disciplinary Segregation to Administrative Segregation</u>

51.     Approximately two weeks prior to Mr. Paul's SHU release date, an inmate riot at Clinton led to the sudden need for a large number of SHU cells.  Consequently, Mr. Paul, along with several other SHU inmates who had a short amount of disciplinary time remaining, were given bags and told they were being sent to general population.

52.     While those other inmates were returned to general population, Mr. Paul was held back and told that "Albany" was required to sign off on all of his transfers.  Shortly thereafter, Mr. Paul was told that his status would be changed from disciplinary SHU to Administrative Segregation.

53.     On August 10, 2009, only a couple of weeks after Mr. Paul's release from serving five years of disciplinary segregation—a term that was reduced from his original 10-year sentence due to his exemplary behavior during that time period—Mr. Paul was sentenced to an indeterminate sentence of Administrative Segregation.

54.     Pursuant to 7 N.Y.C.R.R. § 301.2(a), a disciplinary segregation term lasts "for a designated period of time as specified by the hearing officer."  Once that time elapses, the statute does not empower DOCCS to punish the inmate doubly for the same infraction by imposing further disciplinary segregation.[20]

---

[20] *See id.*

55.    Confinement to the SHU on the basis of Administrative Segregation, on the other hand, is indefinite.  Ad Seg is intended to remove an inmate from the general population when he "pose[s] a threat to the safety and security of the [prison] facility.[21]  Ad Seg terms are open-ended and do not require that DOCCS predetermine when it will release an inmate—"[a]t any time when deemed appropriate [by DOCCS], an inmate may be evaluated and recommended for return to general population."[22]

56.    Unlike those in disciplinary segregation, Mr. Paul has remained in Ad Seg indefinitely, without a specified end date, despite having a clean disciplinary record for the entirety of his five years in disciplinary SHU, as well as for the vast majority of his subsequent 12 years in Administrative Segregation.  Furthermore, the conditions that Mr. Paul faces in Ad Seg are identical to those of disciplinary segregation, even though Mr. Paul did not violate a single rule during the five continuous years he spent in disciplinary segregation.

<u>Conditions of Solitary Confinement on the Basis of Administrative Segregation</u>

57.    Mr. Paul has spent nearly 13 continuous years in solitary confinement on the basis of Administrative Segregation, including the two years he has now spent in the BHU and RMHU under conditions substantively identical to Ad Seg.

58.    While in Ad Seg, Mr. Paul has been kept under conditions of extreme isolation, sensory deprivation, and restricted movement.  He is confined to a small, concrete cell for 20 to 22 hours per day.  Unlike those in the general prison population, he is denied all work, cultural, and social opportunities.  He has severely limited recreational and religious opportunities, limited access to personal property, and limited contact with family and friends.

---

[21] *Id.* § 301.4(b).

[22] *Id.* § 301.4(e).

59.    Mr. Paul is further denied access to opportunities for group meals, group education, and group prayer.  He receives all his meals through a slot in his door and eats alone in his cell.  Until his transfer to the BHU in early 2020, Mr. Paul was not permitted to attend therapeutic groups or programs for his mental health and behavioral needs.

60.    Mr. Paul has had limited human interaction while in Ad Seg.  His only daily human interaction is usually with correctional officers or medical staff for a few minutes at a time.  Mr. Paul's August 2020 transfer to the RMHU has not ameliorated the isolating conditions of his confinement.

61.    Mr. Paul's personal property has been limited during his Ad Seg confinement.  While SHU occupants are allowed personal belongings, those allowances are more limited in Ad Seg than in disciplinary segregation.  Thus, even though Mr. Paul served his sentence of disciplinary segregation, his property is now more restricted than that of someone who is subject to disciplinary penalties.

<u>Transfers to the Behavioral Health Unit and Residential Mental Health Unit</u>

62.    In January 2020, the Office of Mental Health ("OMH") designated Mr. Paul a Level 2S ("diagnosed with Serious Mental Illness") due to his rapid mental deterioration caused by the protracted isolation of nearly 17 years in solitary confinement.  While Mr. Paul was told that the goal was to get him into an RMHU program to begin his transition to general population, he was instead transferred to the Behavioral Health Unit ("BHU") at Great Meadow.

63.    The BHU is a program that "provides services to a target population of inmate-patients currently diagnosed as Seriously Mentally Ill (SMI), who have demonstrated a history of treatment resistance and poor custodial adjustment/behavior, and have Special Housing Unit

(SHU) sanctions."[23]  Mr. Paul was placed into the BHU despite the fact that he had not received

any misbehavior reports at all for the last three years, and had not received any Tier III

misbehavior reports for the last five years.

64.    When Mr. Paul inquired as to why he was placed in the BHU, intended for

prisoners who have a demonstrated history of poor custodial adjustment and behavior, rather

than the RMHU, Defendant Miller, then Superintendent of Great Meadow, told Mr. Paul that he

had "made [his] bed and must lie in it."

65.    The conditions in the BHU are not meaningfully different from the conditions in

Ad Seg—indeed, while in the BHU, Mr. Paul was denied the PIMS Level III[24] privileges to

which he had been entitled in Ad Seg, such as commissary food purchases, use of a tablet, one

extra shower per week, personal sneakers and shorts, front cuff, no waist chain, etc.

66.    Although Mr. Paul completed the 60-day BHU program in March 2020, his

transfer out of the program was put on hold due to the COVID-19 pandemic.  Growing

increasingly despondent due to the conditions in the BHU, which were even more limiting than

the conditions in Ad Seg, Mr. Paul attempted to commit suicide by swallowing over 30 pills, and

subsequently engaged in a hunger strike.

67.    On August 26, 2020, Mr. Paul was transferred from the BHU at Great Meadow to

the RMHU at Five Points.  The RMHU is designed to "address the special needs of inmate-

patients currently diagnosed with a serious mental illness who, due to their disciplinary status,

---

[23] New York State Department of Corrections and Community Supervision, Bureau of Mental Health, *Mental Health Program Descriptions* at 1 (Jul. 5, 2011).

[24] The Progressive Inmate Movement System ("PIMS") is a uniform behavioral incentive program for prisoners assigned to SHUs or Residential Rehabilitation Units.  The system entails progressive increases in privileges for inmates who maintain good behavior.  PIMS Level III, the level Mr. Paul has attained, is the least restrictive status, providing the greatest number of privileges.

are serving time in a SHU[.]"[25]   As described above, Mr. Paul was no longer serving SHU time for disciplinary sanctions.

68.     The conditions in the RMHU are not meaningfully different from the conditions in Ad Seg.  Indeed, corrections officers have provided Mr. Paul with conflicting information as to whether his transfer to the RMHU constitutes a "release" from Ad Seg.

69.     The main difference between the RMHU and Ad Seg is that RMHU involves four hours[26] of mental health and/or behavioral programming during each weekday.  During programming, RMHU residents are shackled to their desks unless they have achieved the highest level of privileges.  Some instructors allow prisoners to communicate during programming; others do not.

70.     As he did in Ad Seg, Mr. Paul eats alone in the RMHU and receives all of his meals on a tray through a slot in his cell door.

71.     In both Ad Seg and the RMHU, Mr. Paul is denied opportunities to participate in activities such as vocational training, group prayer, and group exercise.

72.     Mr. Paul's recreation time in the RMHU is solitary, as it was in Ad Seg.

73.     DOCCS itself has acknowledged that Mr. Paul is still in Ad Seg despite his assignment to the RMHU.  Since being transferred to the RMHU, Mr. Paul has continued to receive Ag Seg reviews.  While the RMHU manual states that a prisoner in RMHU is "not considered to be in SHU,"[27] the fact that he still receives Ad Seg reviews indicates otherwise for

---

[25] New York State Department of Corrections and Community Supervision, Bureau of Mental Health, *Mental Health Program Descriptions* at 2 (Jul. 5, 2011).

[26] As previously discussed, although the RMHU is intended to provide four hours of programming per day, prison officials have reduced the amount of programming to two hours per day due to COVID-19 restrictions.

Mr. Paul.  For example, numerous reviews that occurred after Mr. Paul's August 2020 RMHU

transfer all recommend "his continued placement in Administrative Segregation."  The repeated

rubber-stamping of Mr. Paul's Ad Seg reviews following his transfer to the RMHU indicates that

DOCCS does not intend to release him to the general prison population.

<u>Failure to Conduct Meaningful Administrative Segregation Reviews</u>

74.    For almost 11 years—from his July 2009 placement until his January 2020

transfer to BHU—Mr. Paul was held in solitary confinement on the purported basis of Ad Seg.

Mr. Paul has now been in solitary confinement in the BHU and RMHU for a little over two

years, still on the purported basis of Ad Seg.

75.    Following his initial placement in Ad Seg, and in accordance with 7 N.Y.C.R.R.

§ 301.4, DOCCS was required to conduct a review of Mr. Paul's Ad Seg status every 60 days.

Section 301.4 requires the committee to review the prisoner's institutional record and write a

report setting forth: "(i) reasons why the inmate was initially determined to be appropriate for

administrative segregation; (ii) information on the inmate's subsequent behavior and attitude;

and (iii) any other factors that they believe may favor retaining the inmate in or releasing the

inmate from administrative segregation."

76.    Section 301.4 was revised to a 30-day review cycle in April 2017.  From that time

to present, Mr. Paul has inconsistently received Ad Seg reviews, contrary to the 30-day

requirement.

77.    To ensure that a correctional facility "does not use Ad Seg as a pretext to commit

an inmate to the SHU indefinitely, the Due Process Clause of the Fourteenth Amendment

---

[27] New York State Department of Corrections and Community Supervision, Bureau of Mental Health, *Mental Health Program Descriptions* at 1 (Jul. 5, 2011).

mandates that prison officials periodically review whether an inmate continues to pose a threat to the facility."[28]

78.   The Second Circuit has held that meaningful periodic reviews of Ad Seg status must at least satisfy three criteria: First, the reviewing officials "must actually evaluate whether the inmate's continued Ad Seg confinement is justified"—it is "not sufficient for officials to go through the motions of nominally conducting a review meeting when they have developed a pre-review conclusion that the inmate will be confined in Ad Seg no matter what the evidence shows."[29]  Review with a "pre-ordained outcome," the court observed, "is tantamount to no review at all."[30]

79.   Second, the reviewing officials "must evaluate whether the justification for Ad Seg exists at the time of the review or will exist in the future, and consider new relevant evidence as it becomes available."[31]  Ongoing Ad Seg reviews "may not be frozen in time, forever rehashing information addressed at the inmate's initial Ad Seg determination."[32]  The test "is not whether the confined inmate *was* a threat to the facility when he was confined initially; it is whether the inmate *remains* a security risk on the date of the periodic review."[33]

80.   Finally, the reviewing officials "must maintain institutional safety and security (or another valid administrative justification) as their guiding principles throughout an inmate's Ad

---

[28] *Proctor v. Leclaire*, 846 F.3d 597, 601 (2d Cir. 2017).

[29] *Id.* at 610.

[30] *Id.*

[31] *Id.* at 611.

[32] *Id.*

[33] *Id.* (emphases in original) (internal quotation marks omitted).

Seg term"—the state "may not use Ad Seg as a charade in the name of prison security to mask indefinite punishment for past transgressions."[34]

81.    However, despite this constitutional mandate, the reviews that Mr. Paul has received do not meaningfully evaluate whether his Ad Seg status continues to be justified.

82.    Instead, the reviews contain substantially similar information and use formulaic, boilerplate language that does not consider any changed circumstances since the prior review.

83.    From October 2009 to present, Mr. Paul's reviews have consisted of the same recitation of his 2004 crime at Attica, for which he has already served his sentence of disciplinary segregation.  As discussed above, Mr. Paul's 10-year sentence was reduced to five years in recognition of his exemplary behavior while in disciplinary SHU.

84.    Very few of Mr. Paul's reviews have reported instances of additional misbehavior, yet his Ad Seg status did not change.  Indeed, Mr. Paul has not received a single misbehavior report for the last four years, and has not received any Tier III misbehavior reports for the last six years.  Furthermore, Mr. Paul's Ad Seg status did not change even during periods of time when DOCCS officials acknowledged his positive behavior.

85.    For example, his October 3, 2019 review states that Mr. Paul "has only received one misbehavior report (refusing a direct order) since arriving at [Great Meadow]" and further notes that he "is usually quiet and respectful during rounds," "communicates well with both the unit staff and the facility administration," and "is currently a PIMS level III [the highest level of privileges awarded]."  Nonetheless, the Great Meadow FLRC, including Defendants Caron and Cresswell, found that there was "no compelling information that would lead this committee to believe that inmate Paul has changed his true pattern of behavior or lessened his impact on the

---

[34] *Id.*

24

safety and security of the facility[.]"  In its summary dated October 8, 2019, the Central Office committee added that Mr. Paul's "interactions with staff are always appropriate, respectful, and polite."  Nevertheless, the Central Office committee recommended and Defendant O'Gorman, then DOCCS Deputy Commissioner, determined, without providing (or possessing) any factual basis, that "inmate Paul's placement is appropriate at this time."

86.    Additional reviews have continually acknowledged Mr. Paul's sustained good behavior and positive attitude.  His February 16, 2021 Central Office review, for example, notes that Mr. Paul's "communications with Security and Line staff are appropriate" and adds that "there has been no negative feedback about his interactions with staff or other inmates."  In fact, the committee noted that Mr. Paul "is one of the best inmates with respect to both his personal hygiene and cell maintenance."  Nonetheless, the Five Points FLRC, including Defendants Tucker and Woodward, found that "Inmate Paul poses an unacceptable risk to the safety and security of both staff and inmates alike," the Central Office committee concluded that Mr. Paul's placement in Ad Seg "maintains the safety and security of the facility due to his unpredictable violent conduct at the time of the instant offense, which occurred while in custody at Attica CF," and Defendant Noeth stated that he concurred with the committee recommendation.

87.    As another example, Mr. Paul's June 8, 2021 Central Office review states that he "has appropriate conversations with Security and Line staff," "expresses his concerns and wishes appropriately," and "is eager to transition in any way he can."  Still, the Five Points FLRC, including Defendant Tucker, found that Mr. Paul posed an "unacceptable risk" to the safety and security of the facility, the Central Office committee concluded that "Inmate Paul is properly placed in Administrative Segregation," and Defendant Noeth stated that he agreed with the committee recommendation.

25

88.    Similarly, Mr. Paul's September 28, 2021 Central Office review states that his "interactions with executive staff have been cordial" and notes "[l]ine staff did not report any problems or concerns regarding his behavior or communications with them or other incarcerated individuals on the unit."  Nevertheless, the Five Points FLRC, including Defendants Tucker and Delmar, found that Mr. Paul posed an "unacceptable risk" to the safety and security of the facility, the Central Office committee concluded that "Inmate Paul's current placement is appropriate," and Defendant Noeth concurred with the committee recommendation.  The Central Office committee added: "We encourage I/I Paul to continue with his positive behavior and programming."

89.    The Central Office committee, in subsequent reviews, continued to "encourage I/I Paul to continue with his positive behavior and programming," even as it concurrently pointed to the lack of any "problems or concerns regarding [Mr. Paul's] behavior or communications with [line staff] or other incarcerated individuals on the unit" (October 26, 2021 review); found that Mr. Paul "continue[d] to exhibit appropriate behavioral adjustment to his administrative segregation placement," interacted appropriately with staff and inmates, and "did not register any complaints nor was he a behavioral issue" (November 23, 2021 review); noted Mr. Paul's "interactions with executive staff were appropriate" and that "[l]ine staff did not report any problems or concerns regarding his behavior or communications with them or other incarcerated individuals on the unit" (December 21, 2021 review); and found, again, that Mr. Paul "continue[d] to exhibit appropriate behavioral adjustment to his administrative segregation placement," his "interactions with staff and incarcerated individuals were appropriate," and his "personal and cell hygiene [were] good" (January 18, 2022 review).  For each of these review periods, the Five Points FLRC, including Defendants Tucker and Delmar, found that Mr. Paul

posed an "unacceptable risk" to the safety and security of the facility, the Central Office committee concluded that "Inmate Paul's current placement is appropriate," and Defendant Noeth concurred with the committee recommendation.

90.     Earlier reviews also recognized Mr. Paul's positive behavior and attitude.  For example, his December 5, 2018 Central Office review states: "Inmate Paul has been consistent in his behavior since the prior review period.  He is seen on daily rounds and is consistently quiet and respectful to security and line staff.  His personal hygiene is very good, and he keeps his cell clean and orderly."  The Great Meadow FLRC, including Defendant Cook, had noted in its review dated November 30, 2018 that Mr. Paul was "quiet and respectful during rounds" and "communicates well with both the unit staff and the facility administration."  Nevertheless, Defendant O'Gorman concluded that Mr. Paul's placement in Ad Seg was "appropriate at this time."  Similarly, Mr. Paul's April 4, 2016 Central Office review notes that Mr. Paul "follows orders, acts appropriately and seems to be positive about almost everything."  The DOCCS Deputy Commissioner nonetheless determined, without any factual basis, that Mr. Paul must remain in Ad Seg because his release therefrom "would pose an undue risk to the safe and orderly operations of any Correctional Facility."  Likewise, Mr. Paul's February 3, 2015 review states that he "continues to interact with staff and inmates appropriately.  He has not received a misbehavior report since 6/29/12.  Paul continues to act appropriately and has a positive disciplinary record."  The DOCCS Deputy Commissioner justified continuing to hold Mr. Paul in Ad Seg, however, "in the best interest of institutional safety."

91.     In the months immediately prior to his OMH designation of Level 2S, Mr. Paul's Ad Seg reviews frequently recommended that he would be a good candidate for a step-down program for eventual return to general population.  For example, his October 8, 2019 Central

Office review notes that "with continued appropriate behavior[,] inmate Paul may be a candidate for a step-down program at some point."

92.     Likewise, his December 3, 2019 Central Office review states: "The facility recommended that inmate Paul be considered for a step-down program but stated that both the facility and inmate Paul understand the current available program is at Attica Correctional Facility.  Currently, transition to the step-down program is not possible for inmate Paul as his crimes are too notorious for transfer to Attica.  When a new program begins operation at another facility, and if his appropriate behavior and positive adjustment continues, he should be considered as an early candidate for transition to the step-down program."

93.     However, following his OMH designation of Level 2S and subsequent transfers to the BHU and RMHU, Mr. Paul's Ad Seg reviews abruptly ceased reference to his candidacy for a step-down program, despite the fact that these same reviews continued to report positively on his presentation and behavior.  For example, his April 21, 2020 Central Office review notes that "Inmate Paul has been consistent in his behavior since the prior review period.  He is seen on daily rounds and is consistently quiet and respectful to security and line staff.  His personal hygiene is excellent, and he keeps his cell clean and orderly."  But this information did not matter, and the Great Meadow FLRC recommended and Defendant O'Gorman decided that Mr. Paul's continued Ad Seg status was appropriate "for the safety and security of the facility and staff."

94.     Likewise, Mr. Paul's June 16, 2020 Central Office review notes that "[h]is personal and cell hygiene remain excellent and he is respectful in his interactions with executive, line staff and other facility personnel."  The Great Meadow FLRC (including Defendants Ryan and Caron) similarly notes, in its summary dated June 11, 2020, that Mr. Paul was "quiet and

respectful during rounds," "communicates well with both the unit staff and the facility administration," and was "participating in programs without issue" prior to the COVID-19 pandemic. Nonetheless, Defendant O'Gorman concluded that, "[b]ased on the information provided[,] inmate Paul's placement is appropriate."

95.     Mr. Paul's reviews following his transfer to the RMHU at Five Points provide additional examples of the failure of the FLRC Defendants and DOCCS Commissioner Defendants to undertake meaningful review of his Ad Seg status. Nearly all of the reviews Mr. Paul has received while at Five Points, for a period totaling almost two years, direct him to "SEE ATTACHED" in reference to the summary report of the facility three-member committee and/or the report of the Central Office committee; however, no attachments have been provided despite Mr. Paul's repeated requests for same. In fact, DOCCS personnel have informed Mr. Paul that the Five Points Superintendent, Defendant Lamanna, has advised that Mr. Paul is not entitled to review the attached portions of his Ad Seg reviews.[35] To this end, Offender Rehabilitation Coordinator Sheena Ector provided Mr. Paul with a memo to file dated December 6, 2021, which states: "You had inquired about receiving the attached page(s) that are listed on the Administrative Segregation Review form. It was advised that you are unable to receive the attachments." Preventing Mr. Paul from viewing the attached pages of his Ad Seg reviews has deprived him of the opportunity to submit a written statement addressing the substance of each review, as he is entitled to do pursuant to 7 N.Y.C.R.R. § 301.4(d)(4). Nonetheless, Defendants O'Gorman, Amoia, and Noeth have continuously asserted, without any factual support, that Mr. Paul's placement in Ad Seg "is appropriate at this time."

---

[35] In the 11 years that Mr. Paul spent in Administrative Segregation at Clinton and Great Meadow Correctional Facilities prior to his arrival at Five Points, he was never once denied the opportunity to view either the facility committee summary or the Central Office portions of his Ad Seg reviews, nor was he told that he was not entitled to receive those portions of his reviews.

96.     While Mr. Paul has been unable to obtain his substantive Ad Seg reviews since his transfer to Five Points, counsel has been able to obtain a portion of these records through Freedom of Information Law request to DOCCS and discovery requests.  Like the reviews from his time at Clinton and Great Meadow, Mr. Paul's Ad Seg reviews from his time at Five Points merely recite boilerplate, formulaic language and fail to consider any changed circumstances since the previous review.

97.     For example, Mr. Paul's Central Office review dated September 1, 2020 notes: "Inmate Shondell is seen routinely on rounds and has appropriate conversations with Security and Line staff.  He has stated that he just wants to do his time and program.  His personal hygiene is good, and he maintains his cell in a clean, orderly manner."  His facility committee summary from that review period, dated August 28, 2020 and signed by Defendant Tucker and other members of the Five Points FLRC, likewise notes that Mr. Paul was "respectful and cooperative with staff upon arrival to Five Points" and had "expressed interest in programming." Nevertheless, the review concludes: "At this time, it is the opinion of this Committee that Inmate Paul is properly placed."  Defendant O'Gorman signed off on this conclusion, writing: "Inmate Paul's placement is appropriate at this time."

98.     Similarly, Mr. Paul's September 29, 2020 Central Office review notes: "[Mr. Paul] maintains appropriate communications with Executive, Security, and Line staff as well as with the inmates housed on either side of him.  His personal hygiene and cell maintenance remain very good.  [ . . . ] While housed in the RMHU, there have been no additional concerns raised during the current review period.  It is noted that he communicates well, attends his programs and is appropriate with the other inmates."  His facility committee summary from that review period, dated September 24, 2020 and signed by Defendants Tucker, Woodward, and

other members of the Five Points FLRC, likewise notes that Mr. Paul was "respectful and cooperative with staff" and was "participating in programs and all earned incentives." Nevertheless, the review concludes: "Due to his history of unpredictable assaultive behavior, both the facility and Central Office Committee agree that Inmate Paul continues to be properly placed in Administrative Segregation." Defendant O'Gorman signed off on this conclusion, writing: "Present placement is appropriate at this time."

99.    As these examples indicate, Mr. Paul's reviews do not reflect any new negative information about Mr. Paul's conduct. From 2009 through present, the review committee has copied nearly verbatim the description of Mr. Paul's attack at Attica and cited this incident, which occurred in 2004, as the primary justification for his continued placement in solitary confinement—despite the fact that Mr. Paul successfully served his sentence of disciplinary segregation with exemplary behavior. For nearly 13 years, the FLRC Defendants and Defendants O'Gorman, Amoia, and Noeth have continually observed and noted—yet disregarded—Mr. Paul's good behavior in light of his stated "history of highly assaultive behavior." In fact, the continued characterization of Mr. Paul in these reviews as "an extremely assaultive and dangerous individual" is a direct copy-and-paste from Mr. Paul's original Ad Seg recommendation dated July 23, 2009—nearly *13 years ago*. It is clear that Defendants here are "us[ing] Ad Seg as a charade in the name of prison security to mask indefinite punishment for past transgressions."[36]

100.    According to DOCCS regulations, the DOCCS Deputy Commissioner has the responsibility to conduct an independent review of the Central Office committee's recommendation to continue an inmate's confinement in administrative segregation.[37] Upon

---

[36] *Proctor v. Leclaire*, 846 F.3d 597, 611 (2d Cir. 2017).

information and belief, however, Deputy Commissioners regularly rubber-stamp Central Office committee determinations without conducting any independent analysis.

101.    Upon information and belief, the Superintendent Defendants were required to meet regularly with the FLRC Defendants to review reports and records of Mr. Paul's case that described his condition and deterioration.  The DOCCS Superintendents are also responsible for reviewing inmates' complaints and grievances.

102.    Upon information and belief, the Superintendents consistently failed to review the relevant materials about Mr. Paul before confirming the recommendations of the FLRC.

103.    Upon information and belief, the DOCCS Deputy Commissioner and each of the DOCCS Superintendents were involved in at least one decision since May 2019 to continue the confinement of Mr. Paul in Ad Seg or RMHU.  Each of Mr. Paul's reviews require the signature of, and were signed by, one of the DOCCS Superintendents or the DOCCS Deputy Commissioner.  Upon information and belief, the DOCCS Superintendents and the DOCCS Deputy Commissioner involved in each of Mr. Paul's administrative segregation reviews all failed to conduct any analysis or genuine consideration of Mr. Paul's circumstances.  Instead, they rubber-stamped the decisions of the disciplinary review boards and denied Mr. Paul his right to meaningful review of his Ad Seg status.

104.    The DOCCS Commissioner Defendants were aware of the policies and practices in which the relevant disciplinary officers rubber-stamped Mr. Paul's reviews and denied him of his right to a meaningful review of his Ad Seg status.  With full knowledge of such practices, the DOCCS Commissioner Defendants endorsed the continued imposition of solitary confinement, despite having no basis for such continued imposition.

---

[37] *See* 7 N.Y.C.R.R. § 301.4(d)(3).

105.    Upon information and belief, Defendant O'Gorman, in his role as Deputy Commissioner, on at least one occasion since May 2019, reviewed, approved, and signed off on the Central Office committee's continued decisions to keep Mr. Paul confined in Ad Seg, in knowing disregard of the lack of justification for such confinement.

106.    Upon information and belief, Defendant Amoia, in her role as Acting Deputy Commissioner, on at least one occasion since May 2019, reviewed, approved, and signed off on the Central Office committee's continued decisions to keep Mr. Paul confined in Ad Seg, in knowing disregard of the lack of justification for such confinement.

107.    Upon information and belief, Defendant Noeth, in his role as Deputy Commissioner, on at least one occasion since May 2019, reviewed, approved, and signed off on the Central Office committee's continued decisions to keep Mr. Paul confined in Ad Seg, in knowing disregard of the lack of justification for such confinement.

108.    The DOCCS Superintendent Defendants were aware of the policies and practices in which the relevant disciplinary officers rubber-stamped Mr. Paul's reviews and denied him of his right to a meaningful review of his Ad Seg status.  However, the DOCCS Superintendents failed to remedy the policies and practices to require a meaningful review of Mr. Paul's Ad Seg status, and indeed endorsed his continued solitary confinement despite the lack of any basis for such confinement.

<u>Medical and Mental Health Consequences of Solitary Confinement</u>

109.    Mr. Paul has serious physical and mental conditions that have been caused or exacerbated by his nearly 18 years of continued isolated confinement.

110.    In addition to being deprived of the minimal civilized measure of life's necessities as described above, Mr. Paul also experiences unrelenting and crushing mental anguish, as well

as physical pain and suffering as a result of the years he has spent without normal human interaction in stark and restrictive conditions, without any hope of release or relief.

111.   The devastating psychological and physical effects of prolonged solitary confinement are well documented by social scientists: prolonged solitary confinement causes prisoners significant mental harm and places them at grave risk of even more devastating psychological harm.  Mental health professionals have repeatedly and strongly cautioned against the use of solitary confinement in light of the serious, often irreversible, damage it causes.  The Supreme Court has recognized that research "confirms what th[e] Court suggested over a century ago: Years on end of near-total isolation exact a terrible price."[38]

112.   Even brief periods of solitary confinement can result in serious and debilitating physical consequences.[39]  Individuals held in solitary confinement for even a short period of time commonly experience problems such as sleep disturbances, diaphoresis (excessive sweating, as experienced by people in shock), back pain, joint pain, deterioration of eyesight, and shaking, as well as the aggravation of pre-existing medical conditions.[40]

---

[38] *See Davis v. Ayala*, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring) ("Common side effects of prolonged solitary confinement include anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors.") (quoting Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J. L. & Pol'y 325 (2006)).

[39] *See* Craig Haney's testimony and the Statement of the Physicians for Human Rights made and submitted to the Senate Judiciary Committee on the Constitution, Civil Rights and Human Rights Hearing on Solitary Confinement, June 19, 2012.  Senate Judiciary Subcommittee on the Constitution, Civil Rights, and Human Rights Hearing on Solitary Confinement, 112th Cong. 12-13 (2012), *available at* https://www.judiciary.senate.gov/imo/media/doc/12-6-19HaneyTestimony.pdf.

[40] *See* Physicians for Human Rights, Buried Alive: Solitary Confinement in the US Detention System 1-2 (April 2013), *available at* https://phr.org/wp-content/uploads/2013/04/Solitary-Confinement-April-2013-full.pdf.

113.    Prolonged solitary confinement also causes severe psychiatric harm.  Those held in solitary confinement may experience hypersensitivity to external stimuli, auditory and visual hallucinations, panic attacks, obsessive thoughts, paranoia, and decreased impulse control.[41]

114.    Mr. Paul has experienced many of these aforementioned physical conditions, including irritability, appetite loss, delusions, sleeplessness, depression, sensitivity to light, chronic migraines, and back pain.  While he was housed at Clinton from 2009 to 2016, Mr. Paul began suffering from chronic migraines, which he attributes to the constant screaming, banging, and rank odor in SHU.

115.    Serious forms of mental illness can either develop from or be exacerbated by even short periods of isolation.  The symptoms of these illnesses include: significantly increased negative attitudes and affect, irritability, anger, aggression, rage, fear of impending emotional breakdowns, a loss of control, and panic attacks.[42]

116.    Mr. Paul is diagnosed with Persistent Depressive Disorder and Adjustment Disorder.  From mid-2009 until his transfer to the BHU in January 2020, Mr. Paul was denied mental health programming because he was in Ad Seg for alleged disciplinary reasons.  Mr. Paul's mental health programming did not resume until 2020, when he was transferred to the BHU and subsequently the RMHU.  The extreme isolation has caused his mental health to deteriorate, causing Mr. Paul to suffer increased anxiety, hypersensitivity, bouts of depression, delusional thinking, mood swings, hallucinations, and insomnia.

---

[41] *See* Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J. L. & Pol'y at 333.

[42] *See* Senate Judiciary Subcommittee on the Constitution, Civil Rights, and Human Rights Hearing on Solitary Confinement, 112th Cong. 10-11 (2012).

<u>Failure to Accommodate Mr. Paul on the Basis of His Disabilities</u>

117.     Defendants have refused to modify their Ad Seg and RMHU policies and practices to accommodate Mr. Paul's disabilities and protect him from harm caused by solitary confinement.

118.     Since DOCCS placed him in solitary confinement almost 18 years ago, Mr. Paul has suffered from ongoing and severe mental health issues related to and because of prolonged isolation.  Until one year ago, Mr. Paul did not have access to the programs and treatment that could alleviate his mental health issues.  The denial of programming and treatment was based on his status in Ad Seg.

119.     Defendants are well aware of the harms associated with its solitary confinement policies and practices, as they have acknowledged the associated risks in other lawsuits.[43] However, Defendants have failed to modify its policies and procedures to reasonably accommodate Mr. Paul's disabilities by, among other things: (1) failing to modify its policies and procedures to ensure that Mr. Paul is not placed in prolonged isolation, which caused and exacerbated his mental health symptoms; (2) failing to modify its policies and procedures to ensure that Mr. Paul's disabilities are considered in the initial and continued placement in solitary confinement; and (3) failing to modify its policies and procedures to ensure that Mr. Paul is offered adequate out-of-cell time, social interaction, environmental stimulation, and mental health treatment to prevent worsening of his mental health symptoms while he is in solitary confinement.

---

[43] *See, e.g.*, Order Granting the Parties' Joint Motion for Final Approval of Class-Action Settlement, *Peoples v. Fischer*, No. 11-cv-2694 (S.D.N.Y. Apr. 1, 2016), ECF No. 331.

<u>Mr. Paul Has Exhausted All Administrative Remedies</u>

120.    Mr. Paul has exhausted administrative remedies, submitting grievances based on his subjection to solitary confinement on the basis of his long-ago misconduct—despite a recognized pattern of good behavior thereafter—and appealing the denials of such grievances.

121.    In December 2017, while housed in Ad Seg at Great Meadow, Mr. Paul submitted a grievance challenging his continuous and ongoing solitary confinement through DOCCS's Inmate Grievance Program.  He received a response from the Inmate Grievance Review Committee denying his grievance.  He appealed to the Great Meadow Superintendent, Defendant Miller, who also denied his grievance.  He then appealed the Superintendent's decisions to the Central Office Review Committee of the Inmate Grievance Program, which issued a final denial of his grievance.

122.    Mr. Paul has also submitted grievances to the DOCCS Deputy Commissioner and the Superintendent Defendants challenging his continuous solitary confinement on many other occasions, including June 2017, October 2013, July 2013, March 2013, and June 2010, putting the Defendants on notice of the challenged unconstitutional behavior.

<u>Our Evolving Standards of Decency Demand Significant Limits on the Use of Prolonged Solitary Confinement</u>

123.    Recognizing the severe and often irreversible harm caused by solitary confinement, a wide range of highly-regarded professional groups and international organizations have publicly announced their commitment to sharply limiting or abolishing solitary confinement.  Medical health professional associations, legal organizations, prisoner re-entry organizations, correctional organizations, religious organizations, and international human rights bodies echo scientific research admonishing the use of solitary confinement.

124.    The nation's most highly regarded medical health professional organizations have condemned the use of solitary confinement, particularly its use on adolescents and those with mental illness.

125.    The American Psychiatric Association has stated that, with "rare exception," prisoners with mental illnesses should never be subjected to prolonged isolation, due to the real and serious potential for harm.[44]  The American Academy of Child and Adolescent Psychiatry has similarly noted that "the potential psychiatric consequences of prolonged solitary confinement are well recognized and include depression, anxiety, and psychosis."[45]

126.    Notably, the National Commission on Correctional Health Care ("NCCHC") has declared that solitary confinement for longer than 15 consecutive days is "cruel, inhumane and degrading treatment, and harmful to an individual's health," and advises that "[h]ealth care staff must advocate so that individuals are removed from solitary confinement if their medical or mental health deteriorates or if necessary services cannot be provided."[46]  In its Position Statement on Solitary Confinement, the NCCHC reports that "[t]hose in solitary confinement often experience sensory deprivation and are offered few or no educational, vocational, or rehabilitative programs."[47]

---

[44] *See* American Psychiatric Association, *APA Position Statement on Segregation of Prisoners with Mental Illness* (2012), *available at* https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Psychiatric-Services-in-Adult-Correctional-Facilities.pdf.

[45] *See* Solitary Confinement of Juvenile Offenders (Approved by Council, Apr. 2012), *available at* https://www.aacap.org/aacap/Policy_Statements/2012/Solitary_Confinement_of_Juvenile_Offenders.aspx (citing Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J. L. & Pol'y, 325, 325-83 (2006)).

[46] National Commission on Correctional Health Care, Position Statement on Solitary Confinement (Isolation) (2016), *available at* https://www.ncchc.org/solitary-confinement.

[47] *Id.*

38

127.   Professional legal organizations recommend serious restrictions on the use of solitary confinement.  The New York State Bar Association has stated that "solitary confinement, if used at all, should be measured in *days*, not years, months, or even weeks."[48]

128.   International human rights bodies have condemned the use of solitary confinement and issued direct pleas to the United States to halt its continued use of the practice. The United Nations Special Rapporteur on Torture has concluded that 15 days in solitary confinement is considered cruel, inhuman, or degrading treatment or punishment—in other words, torture.[49]  The United Nations Committee Against Torture has expressed great concern over the frequent use of prolonged isolation and has recommended that the United States "[l]imit the use of solitary confinement as a measure of last resort, for as short a time as possible[.]"[50]

129.   Religious leaders from diverse spiritual backgrounds are also united against the continued use of solitary confinement.[51]

---

[48] *See* N.Y. State B. Ass'n. Comm. On Civ. Rts. Report to the House of Delegates, *Solitary Confinement in New York* State, 1, 21 (Approved on Jan. 25, 2013), *available at* http://www.nysba.org/WorkArea/DownloadAsset.aspx?id=26699 (emphasis in original).

[49] *See* Juan E. Mendez, Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *Interim Rep. of the Special Rapporteur of the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, U.N. Doc. A/66/268 (Aug. 5, 2011), *available at* https://documents-dds-ny.un.org/doc/UNDOC/GEN/N11/445/70/PDF/N1144570.pdf? OpenElement.

[50] *See* U.N. Comm. Against Torture, Concluding Observations on the Combined Third to Fifth Periodic Reports of United States of America (Dec. 19, 2014), *available at* https://digitallibrary.un.org/record/790513?ln=en#record-files-collapse-header.

[51] *See, e.g.*, Francis X. Rocca, *Pope Francis Calls for Abolishing Death Penalty and Life Imprisonment*, National Catholic Reporter (Oct. 23, 2014), *available at* https://www.ncronline.org/blogs/francis-chronicles/pope-francis-calls-abolishing-death-penalty-and-life-imprisonment; 220th General Assembly of the Presbyterian Church (USA), Commissioner's Resolution on Prolonged Solitary Confinement in U.S. Prisons (2012), *available at* https://www.pc-biz.org/#/search/4389; The Rabbinical Assembly, Resolution on Prison Conditions and Prisoner Isolation (Passed by the Rabbinical Assembly Plenum May 2012), *available at* https://www.rabbinicalassembly.org/story/resolution-prison-conditions-and-prisoner-isolation.

130.    Nationwide, state and federal legislators have responded to the growing call to abolish the practice of solitary confinement.  The Senate Judiciary Subcommittee on the Constitution, Human Rights, and Civil Rights has held a series of congressional hearings to investigate the widespread use of solitary confinement and its attendant harms.[52]

131.    DOCCS has already acknowledged the harms caused by solitary confinement and agreed to limit its use of the practice in some contexts and for some populations.  In the *Peoples v. Fischer* settlement, DOCCS acknowledged the harms caused by SHU and agreed to systemic changes including providing progressive behavioral incentives for prisoners in SHU, additional beds in behavioral alternative units, and guidelines for Hearing Officers to consider when imposing SHU sanctions.[53]

132.    While a step in the right direction for disciplinary segregation, the *Fisher* settlement provides no relief to prisoners placed in solitary confinement under Ad Seg status.[54] As Mr. Paul's ordeal demonstrates, solitary confinement under such a regime can persist for years without any meaningful review.

## LEGAL CLAIMS

### I.    FIRST CAUSE OF ACTION (ALL DEFENDANTS)
Violations of the Eighth Amendment for Imposing Cruel and Unusual
Punishments that Contravene Standards of Decency

---

[52] *See* U.S. S. Judiciary Subcomm. on Const., Human Rts., & Civ. Rts., Hearing on "Reassessing Solitary Confinement: The Human Rights, Fiscal, and Public Safety Consequences" (Jun. 19, 2012; Feb. 25, 2014), *available at* https://www.judiciary.senate.gov/meetings/reassessing-solitary-confinement-the-human-rights-fiscal-and-public-safety-consequences *and*
https://www.judiciary.senate.gov/meetings/reassessing-solitary-confinement-ii-the-human-rights-fiscal-and-public-safety-consequences.

[53] *See* Order Granting the Parties' Joint Motion for Final Approval of Class-Action Settlement, *Peoples v. Fischer*, No. 11-cv-2694 (S.D.N.Y. Apr. 1, 2016), ECF No. 331.

[54] *Id*. at 28 ("Nothing in this section precludes the continued selective use of Protective Custody or Administrative Segregation in accordance with established procedures.").

133.    Mr. Paul repeats and incorporates the allegations set forth in all of the foregoing paragraphs of this Complaint as though fully set forth herein.

134.    At all relevant times, each of the Defendants acted under color of state law.

135.    Mr. Paul was at all times dependent on the Defendants to protect him from harm and to provide for his basic needs.

136.    The acts and omissions of the Defendants, which resulted in Mr. Paul's continuous solitary confinement for nearly 18 years, contravene standards of decency against the use of long-term solitary confinement.

137.    By their use of the policies and practices described herein, the Defendants caused Mr. Paul to suffer severe harm by knowingly disregarding the substantial risk that being confined in solitary confinement would deprive Mr. Paul of life's necessities, basic human dignity, and the right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

138.    The Defendants' actions have deprived Mr. Paul of basic human needs, such as normal human contact, environmental and sensory stimulation, mental and physical health, physical exercise, sleep, nutrition, and meaningful activity.  Extremely prolonged deprivation of these basic human needs has inflicted serious psychological and physical pain and suffering, as well as permanent psychological and physical injury, on Mr. Paul.  This deprivation of basic human needs, resulting from the cumulative effects of extremely prolonged isolated confinement and the crushing conditions of that confinement, poses a continuing serious and substantial risk of harm.

139.    The risk of harm that Mr. Paul faced and continues to face by being placed in solitary confinement was and continues to be so obvious that knowledge may be inferred under

these circumstances.  It was patently obvious to the Defendants, and to any reasonable person, that the conditions imposed on Mr. Paul over many years would cause tremendous mental anguish, suffering, and pain.

140.    The Defendants' deliberate indifference to Mr. Paul's pain and suffering constitutes more than mere negligence because the Defendants were repeatedly and explicitly made aware, through administrative grievances and written complaints, that Mr. Paul was experiencing significant and lasting physical and psychological injury as a result of his solitary confinement.  As such, these circumstances fully support the conclusion that the Defendants had knowledge of the risk of harm that Mr. Paul faced in solitary confinement.

141.    The policies and practices complained of herein have been implemented by the Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacity.

142.    All Defendants who are current state employees are sued in their official capacity for declaratory and injunctive relief, as each Defendant knowingly allowed the policies and customs that permitted these Eighth Amendment violations to continue under their supervision and authority.  All Defendants are sued in their individual capacity for monetary relief for subjecting Mr. Paul to cruel and unusual punishment that contravenes standards of decency.

## II.    SECOND CAUSE OF ACTION (ALL DEFENDANTS)
<u>Violations of the Eighth Amendment for Imposing</u>
<u>Grossly Disproportionate Sentences to Solitary Confinement that</u>
<u>Serve No Legitimate Penological Purposes</u>

143.    Mr. Paul repeats and incorporates the allegations set forth in all of the foregoing paragraphs of this Complaint as though fully set forth herein.

144.    The Defendants' policy of indefinite and prolonged isolated confinement imposed disproportionate punishment on Mr. Paul.  The Defendants had no legitimate penological interest in retaining Mr. Paul in the debilitating conditions of solitary confinement.

145.    By their acts and omissions, the Defendants have subjected Mr. Paul to a nearly 18-year-long solitary confinement and infliction of significant psychological and physical harm and have subjected him to the risk of future debilitating harm, although he has not committed any serious infraction since his initial placement in Ad Seg.  This confinement serves no legitimate, penological purpose and is a grossly disproportionate punishment, which violates Mr. Paul's Eighth Amendment right to be free from cruel and unusual punishment.

146.    All of the Defendants who are current state employees are sued in their official capacity for declaratory and injunctive relief, as each Defendant knowingly allowed the policies and customs that permitted such violations of the Eighth Amendment to continue under their supervision and authority.  All Defendants are sued in their individual capacity for monetary relief for subjecting Mr. Paul to grossly disproportionate terms of solitary confinement.

### III.    THIRD CAUSE OF ACTION (ALL DEFENDANTS)
Violations of the Fourteenth Amendment Right to
Procedural Due Process for Lack of Meaningful Review

147.    Mr. Paul repeats and incorporates the allegations set forth in all of the foregoing paragraphs of this Complaint as though fully set forth herein.

148.    The Defendants have deprived Mr. Paul of a protected liberty interest in avoiding long-term solitary confinement.  The FLRC Defendants have denied Mr. Paul of both meaningful and timely periodic review of his detention in Ad Seg, as well as meaningful notice of what he must do to earn release, in violation of the Fourteenth Amendment.

149.    Because indefinite placement in Ad Seg constitutes a significant and uncommon hardship, Mr. Paul is entitled to meaningful notice of how he may alter his behavior to rejoin the general prison population, as well as meaningful and timely periodic reviews to determine whether he still warrants detention in Ad Seg.

150.    The FLRC Defendants have denied Mr. Paul of any such notice or meaningful review by: (1) failing to provide Mr. Paul with notice of what he can do in order to be released from Ad Seg; (2) providing misleading notice that he can become eligible to be released from Ad Seg by maintaining "positive" behavior for a significant period, when in fact Mr. Paul had maintained positive behavior and was still housed in Ad Seg; (3) making a predetermination that Mr. Paul will stay in Ad Seg, thus rendering the periodic reviews procedurally meaningless; (4) failing to consider Mr. Paul's changes in behavior over time and whether he remained a security risk to justify his continuous confinement in Ad Seg; and (5) failing to conduct timely reviews and/or provide him with those reviews, thus precluding him from responding, participating, or providing additional information and precluding the review committee themselves from conducting meaningful review.

151.    The DOCCS Deputy Commissioner and DOCCS Superintendents violated and continue to violate Mr. Paul's right to meaningful review of his Ad Seg status by rubber-stamping the decisions of the FLRC Defendants.

152.    The Defendants' actions are in violation of Mr. Paul's due process rights under the Fourteenth Amendment to the United States Constitution.

153.    All of the Defendants who are current state employees are sued in their official capacity for declaratory and injunctive relief, as each Defendant knowingly permitted policies and customs that violated the Fourteenth Amendment right to due process to continue.  All

Defendants are sued in their individual capacity for monetary relief for depriving Mr. Paul of his due process right to meaningful review.

## IV.    FOURTH CAUSE OF ACTION (DOCCS COMMISSIONER DEFENDANTS)
### Violations of the Americans with Disabilities Act

154.    Mr. Paul repeats and incorporates the allegations set forth in all of the foregoing paragraphs of this Complaint as though fully set forth herein.

155.    Mr. Paul is a qualified individual with disabilities as defined in the Americans with Disabilities Act ("ADA").  He has mental and physical impairments that substantially limit one or more major life activities; he has records of these impairments and is regarded as having such impairments.  42 U.S.C. § 12102(2); 42 U.S.C § 12131(2).  Mr. Paul is diagnosed with, among other things, Persistent Depressive Disorder.  His medical and mental health records at DOCCS facilities document these diagnoses.

156.    Mr. Paul is qualified to participate in the services, programs, activities, and benefits provided to incarcerated people in DOCCS custody within the meaning of Title II of the ADA.  By virtue of his confinement in Ad Seg, Mr. Paul is precluded from participating in services, programs and activities and from receiving any benefits provided to incarcerated people in DOCCS custody.

157.    The DOCCS Commissioner Defendants violate the ADA by failing to make reasonable modifications to policies, practices, or procedures when the modifications are necessary to avoid discrimination against Mr. Paul on the basis of his disability.  28 C.F.R. § 35.130(b)(7).

158.    As a result of the DOCCS Commissioner Defendants' policies and practices, Mr. Paul has been unnecessarily placed and retained in isolation due to his disabilities; is denied

equal access to activities, programs, and services for which he is otherwise qualified; and is denied the opportunity to receive services in the most integrated setting appropriate to his needs.

159.    As a direct and proximate cause of these actions and omissions, Mr. Paul has suffered and will continue to suffer from harm and violation of his ADA rights.  These harms will continue unless enjoined by this Court.

160.    Mr. Paul brings this claim against the DOCCS Commissioner Defendants in their official capacities.

## V.    FIFTH CAUSE OF ACTION (DOCCS COMMISSIONER DEFENDANTS)
### Violations of Section 504 of the Rehabilitation Act

161.    Mr. Paul repeats and incorporates the allegations set forth in all of the foregoing paragraphs of this Complaint as though fully set forth herein.

162.    Mr. Paul is an individual with disabilities as defined in Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 705(20), 794.  Mr. Paul is diagnosed with, among other things, Persistent Depressive Disorder.  His medical and mental health records at numerous DOCCS facilities document these diagnoses.

163.    Mr. Paul is qualified to participate in the services, programs, activities, and benefits provided to incarcerated people in DOCCS custody within the meaning of Section 504 of the Rehabilitation Act.

164.    DOCCS is a program or activity receiving federal financial assistance within the meaning of the Rehabilitation Act.  29 U.S.C. § 794.

165.    The DOCCS Commissioner Defendants violate Section 504 of the Rehabilitation Act by failing to reasonably accommodate Mr. Paul, a qualified individual with disabilities within the meaning of the Rehabilitation Act, in its facilities, programs, activities, and services.

166.     As a result of the DOCCS Commissioner Defendants' discrimination and failure to provide reasonable accommodations, Mr. Paul does not have equal access to DOCCS activities, programs, and services for which he is otherwise qualified.

167.     As a direct and proximate cause of these policies, practices, and omissions, Mr. Paul has suffered and will continue to suffer from harm and violation of his rights under Section 504 of the Rehabilitation Act.  These harms will continue unless enjoined by this Court.

168.     Mr. Paul brings this claim against the DOCCS Commissioner Defendants in their official capacities.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff SHONDELL PAUL respectfully asks that this Court:

1.     Declare that the Defendants' acts and omissions violated and continue to violate Mr. Paul's constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution, the ADA, and Section 504 of the Rehabilitation Act, and that these acts and omissions continue to cause an ongoing harm and violation of those rights;

2.     Issue injunctive relief ordering Defendants to release Mr. Paul from solitary confinement in the RMHU or otherwise ameliorate the conditions under which Mr. Paul is held and provide him with effective mental health treatment and programming;

3.     Enter judgment in favor of Mr. Paul for reasonable actual and compensatory, including consequential, damages against each of the Defendants, jointly and severally, to compensate Mr. Paul for his pain, suffering, and other hardships

arising from the Defendants' deliberate indifference to his medical needs and due

process violations;

4.    Enter judgment for Mr. Paul for reasonable punitive damages against each of the

Defendants;

5.    Award Mr. Paul the costs of this action, including reasonable attorneys' fees;

6.    Retain jurisdiction of this case until the Defendants have fully complied with the

orders of this Court; and

7.    Grant such other and further relief as this Court deems just and proper.


Respectfully submitted,

Dated: June 10, 2022                     By: */s/ Ellen M. Dunn*
New York, New York                       Ellen M. Dunn
                                         Dana R. Angood
                                         John G. Plotz (*application for admission
                                         forthcoming*)

                                         **SIDLEY AUSTIN LLP**
                                         787 Seventh Ave
                                         New York, NY 10019
                                         Telephone: (212) 839-5300
                                         edunn@sidley.com
                                         dangood@sidley.com
                                         jplotz@sidley.com

                                         John L. Gibbons
                                         **SIDLEY AUSTIN LLP**
                                         1501 K Street N.W.
                                         Washington, D.C. 2005
                                         Telephone: (202) 736-8000
                                         jgibbons@sidley.com